UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | CHAPTER 7 |
| ) | |
| WILLIAM HOWARD LEACH, JR., ) | CASE NO. 08-60100 |
| Debtor. ) | |
| ) | ADV. NO. 08-6046 |
| ) | |
| ST. MARYS CEMENT CO., ) | JUDGE RUSS KENDIG |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OF DECISION** |
| ) | **(NOT INTENDED FOR** |
| WILLIAM HOWARD LEACH, JR., ) | **PUBLICATION)** |
| Defendant. ) | |
| ) | |

This adversary proceeding arises in the Chapter 7 proceeding of William Howard Leach, Jr. ("Leach" or "Defendant"). St. Marys Cement Co. ("St. Marys" or "Plaintiff") filed this adversary complaint on April 10, 2008 seeking a judgment of nondischargeability under 11 U.S.C. § 523(a)(2). The matter came before the Court for trial on December 15, 2008, and the parties each submitted post-trial briefs on January 12, 2009.

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I). In accordance with Federal Rule of Bankruptcy Procedure 7052, the court's findings of facts and conclusions of law are set forth in this memorandum.

This memorandum is not intended for publication or citation. The availability of this memorandum, in electronic or printed form, is not the result of a direct submission by the Court.

## FINDINGS OF FACT

Based on the record as constructed at trial, the Court finds the following facts to be established:

Defendant is the debtor in the chapter 7 case under which this adversary arises. Plaintiff was a creditor of the defendant and is a creditor of the estate. At all times relevant to the events that are the subject of this litigation, Leach was the president and sole shareholder of William H. Leach Enterprises ("WHLE"). WHLE was the parent and sole shareholder of four subsidiaries: Hartville Redi-Mix, Inc. ("HRM"), Leach Trucking and Disposal Service, Inc., Mogadore Limestone Sales,

Inc., and W.H.L. Leasing, Inc. Leach already owned a one-half interest in Mogadore Limestone when be bought the other one-half interest from his father at some point before his father's death in 1999 for $300,000. Leach originally bought HRM from his father's estate after his father died in 1999, for $1 million. Leach was already in the trucking business before his father died.

Leach has no formal education beyond high school.

HRM's primary supplier of cement at that time was a company called Essroc. In either 2000 or 2001, HRM switched suppliers and began buying from St. Marys. St. Marys sold cement to HRM on credit.

HRM fell behind on its payments to St. Marys. While Leach testified that his companies were profitable in 2000 and 2001, Lucas Mathie ("Mathie"), a witness for the defense, testified that HRM suffered chronic cash flow problems and was consistently late paying bills. (In fact, he testified that he actually left the company for a time, from October 2002 to December 2003, concerned for the future of his position at HRM, believing that the company was in unstable financial condition at the time.) Plaintiff apparently believed that there was uncertainty regarding HRM's financial condition as well, as they asked Leach to personally guarantee HRM's debts to St. Marys. On July 9, 2002, Leach executed a "Guarantee of Past and Future Indebtedness" ("Guarantee") on behalf of HRM in favor of Plaintiff. The Guarantee provided that Leach would personally guarantee up to $500,000 of HRM's indebtedness to St. Marys.

On April 8, 2003, Defendant signed a "Confidential Financial Statement" regarding his financial position as of February 24, 2003 ("February 2003 Statement"). Defendant executed this instrument at his office and delivered it to St. Marys. The method of delivery was disputed at trial.

There was a substantial amount of contradictory testimony at trial regarding if and when the then-credit manager for St. Marys, Charles McFeeters ("McFeeters"), was in Hartville to meet with Leach, and what was said at those meetings if and when they did occur. McFeeters testified that he was there on numerous occasions dating back to 2002, including in July of 2002 to obtain the Guarantee and in April of 2003 to obtain the February 2003 Statement. He also testified that he visited HRM at least once before the date of the signing of the Guarantee, just to get acquainted with HRM and Leach, and that he believed that he made additional visits there in 2003, 2004, and 2005. Leach denied all of these visits; according to Leach, the first time McFeeters personally met with Leach was in July of 2006. Leach testified that he met with Kelly Curtis, a sales manager for St. Marys from Cleveland, at HRM in July of 2002, and that he both signed the Guarantee and gave St. Marys a personal financial statement at that time. Mathie could not recall any visits by McFeeters prior to 2006, though Mathie was absent from the firm for part of that time and would not necessarily have known if McFeeters were visiting even during the times when Mathie was with HRM. Mathie did recall McFeeters' visit to HRM in 2006, however.

The Court finds McFeeters' testimony that he was in Hartville in April of 2003 credible, and for the balance of this opinion, assumes that this meeting took place and that Leach gave McFeeters the February 2003 Statement at that time. McFeeters had the February 2003 Statement with him in July of 2006 when he came to Hartville, which all parties, including Mathie, agree happened.

There is handwriting on the bottom of that statement that Leach himself testified he wrote in 2003. It is implausible that he was only giving McFeeters the February 2003 Statement in 2006, so the more credible conclusion is that McFeeters already had it in his possession and brought it with him to the meeting. The Court is not convinced that McFeeters was in Hartville for the signing of the Guarantee, as Kelly Curtis witnessed that document; as the senior employee, it is more likely than not that McFeeters would have witnessed the document himself had he been present, particularly given that McFeeters testified that he was the drafter of the Guarantee. Moreover, Leach's testimony that he gave Kelly Curtis a copy of his personal financial statement in July of 2002 at the signing of the Guarantee is not credible. Leach did introduce a personal financial statement dated April 30, 2002 (the "April 2002 Statement") (Def.'s Ex. 12), but this was not the document that McFeeters had in his possession. In addition, the April 2002 Statement revealed information of which Plaintiff was clearly ignorant, which the February 2003 Statement did not: the fact that the stocks in Leach's portfolio were actually his interests in WHLE, not publicly traded securities. Since the Court is convinced that the February 2003 Statement is the one that Plaintiff had in its possession, and Defendant made no reference to ever mailing it to St. Marys or otherwise delivering by any manner other than in person, the Court at least finds it more likely than not that McFeeters met with Leach at HRM's headquarters in 2003. However, while the Court assumes for the balance of this opinion that that meeting took place, this does not mean that the Court credits all of McFeeters' recollections of what was said at that meeting, as discussed below.

The February 2003 Statement declared that Defendant personally had a net worth of $7,405,386.00, a substantial portion of which consisted of "stocks owned" worth $3,535,000.00. The February 2003 Statement did not contain an itemization of the "stocks owned;" Leach testified that it did, but the Court finds this testimony questionable, both because of St. Marys' conduct after receiving the one-page document and Plaintiff's Exhibit B, St. Marys' copy of the February 2003 Statement, which, unlike Plaintiff's copy of the November 2003 Statement (Pl.'s Ex. C), shows no staple markings, which appears to be how the itemizations were attached both based on the physical evidence and the operating assumptions of both parties at trial. (Neither party, for example, raised the issue of using a paper clip.) McFeeters testified that, at the April 2003 meeting, he asked for an itemization of the stocks Leach owned; Leach replied that he did not have such an itemization available and that the itemization was with his accountant. McFeeters left the meeting without such an itemization and never received it. Nevertheless, despite not receiving such an itemization, Plaintiff extended HRM forbearance on existing loans, and later, additional credit. No explanation was provided as to why this was done and no good explanation appears feasible. The Court is unsure whether, or how often, St. Marys repeated its request for the itemization of Leach's stocks owned in the weeks and months following that meeting; St. Marys did not produce any e-mails, file copies of letters, or other evidence of subsequent communications with Leach requesting the list of stocks owned, and McFeeters produced no evidence of any trips to Hartville. Lucas Mathie testified that St. Marys' Cleveland office would call with requests for itemizations of the accounts receivable of the company, HRM, but nothing was introduced to convince the Court that St. Marys actually followed up on its request for the list of stocks Leach owned personally before 2006.

The "stocks owned" actually consisted entirely of stock in the companies that Leach owned. McFeeters testified that Leach told him at the time of the meeting in 2003 that the stocks were "marketable securities," but the Court does not find this a credible recollection, even if accepting

3

that the meeting in 2003 happened. Defendant has only a high school education and has never had a brokerage account in his life, and indeed was ignorant on the witness stand of what a broker even is. Leach was credibly ignorant throughout his testimony, which is not the same as saying he appeared credible at all times.

All witnesses agreed that McFeeters again visited Leach at HRM's headquarters in July of 2006. McFeeters testified that he again requested the list of stocks Leach owned at that meeting, and that Leach again replied that he didn't have it. At that meeting, Leach agreed to assign $250,000.00 worth of stock to St. Marys, apparently as collateral, in exchange for additional credit, and McFeeters accepted this offer on behalf of Plaintiff without investigating what stock was being assigned. This transaction is substantiated, though not detailed, by the later-written handwriting on the February 2003 Statement (Pl.'s Ex. B), Defendant's testimony at trial, and the questions asked of Defendant on cross-examination, which assumed the existence of this transaction, pressing instead on the issue of the fact that Plaintiff was assigning an interest in his own companies, not marketable securities. Plaintiff, still unaware that the "stocks owned" on Leach's confidential financial statement were stocks in Leach's own companies, continued to extend HRM credit after the April 2006 meeting.

On December 29, 2006, HRM filed for protection under Chapter 11 of the Bankruptcy Code. That case was dismissed for nonprosecution on November 10, 2008, following a notice of proposed dismissal that the Court entered on October 16, 2008.

On August 30, 2007, Plaintiff filed an action against Defendant personally in state court, alleging breach of the Guarantee. That action is currently stayed due to the filing of the bankruptcy case under which this adversary arises.

On January 15, 2008, Leach filed for bankruptcy under chapter 7 of the Bankruptcy Code. Debtor's Schedule F included a claim for $732,569.35 by St. Marys Cement, listing that debt as contingent, unliquidated, and disputed. At meetings of creditors, Plaintiff obtained copies of other personal financial statements of Defendant's similar in format–and, in most respects, content–to the February 2003 Statement. Plaintiff obtained a copy of a statement of Defendant's personal financial position as of April 30, 2002 ("April 2002 Statement"). The April 2002 Statement also listed the value of Defendant's stocks owned as $3,535,000.00. The April 2002 Statement also contained an itemization of the stocks owned. The April 2002 Statement valued Hartville Redi-Mix at $1,500,000; Leach Trucking & Disposal Service at $1,000,000; Mogadore Limestone at $1,000,000; and Nu Way, Inc. at $35,000. It made no mention of W.H.L. Leasing. Plaintiff also obtained a copy of a statement of Defendant's personal financial position as of November 17, 2003 ("November 2003 Statement"). The November 2003 Statement listed the value of Defendant's stocks owned as $1,210,500.00. No explanation for the decrease of $2.3 million in the value of the companies owned was offered at trial, and Leach himself testified, when told of the lowered figure in November of 2003, that he believed it to be inaccurate, still defending the contention that his companies were worth in excess of $3.5 million at the time.

Defendant displayed a substantial lack of understanding of basic accounting and general business principles on the witness stand. Most saliently, he testified that he produced the figures

4

for the valuations of his companies himself, based on his personal opinion as to what his own companies were worth, what he paid for them, and what he later contributed to them. In addition, while admitting that a parcel of commercial real estate on Myersville Road, appraised at $2,610,000.00 (a professional appraisal was admitted into evidence as Def.'s Ex. 10) was for a time double-counted on both his personal and corporate financial statements, he appeared credibly confused as to the effects that correcting that error would have on the balance sheets of either himself or his company.[1] In addition, he seemed unable to grasp that, because his stocks owned *were* his companies, that having the real estate inaccurately entered on the corporate books inflated the bottom line of his personal financial statements as well by dramatically increasing the stock price. The match between the drop in the stock price and the value of the property is not exact–the stock dropped in value by $2.6 million, not $2.3 million–but Leach also testified that he made periodic additional capital contributions to the WHLE, which plausibly could make the difference, and no other explanation offers itself.

In addition to evidence regarding the composition of Leach's stocks owned and the Myersville Road property, Plaintiff attempted to introduce evidence of a third inaccuracy on the February 2003 Statement (and Leach's other confidential financial statements, for that matter): gambling debts to Bally's Atlantic City in the amount of $16,100.00 and Caesar's Atlantic City in the amount of $18,250.00, both dated from 2000 on Defendant's Schedule F. Leach testified that he had paid off both of these debts. No documentary evidence of either the debts or the payments were provided to the Court. In addition, this was the first time that the issue of these debts had been raised in this adversary at all: Plaintiff did not file a trial brief. Its proposed findings of fact and conclusions of law make no mention of gambling debts. Its motion for summary judgment, despite focusing exclusively on false written representations, did not mention gambling debts. Its complaint makes only the general allegation that Defendant "misrepresented his net worth" in the February 2003 Statement, which, after reading the motions for summary judgment, Defendant's trial brief, and both parties' proposed findings of fact and conclusions of law, the Court took to mean the stock portfolio and the Myersville Road property, both seven-figure controversies.

---

[1] The Court also remains somewhat confused as to exactly when the double-counting occurred, which balance sheet inaccurately reflected the double-counting, and when the error was corrected. Leach testified that the error was in the February 2003 Statement, and earlier in this proceeding, Defendant's response to Plaintiff's motion for summary judgment asserted that Leach became aware of the double-counting in late 2003 while negotiating an SBA loan with Temecula Valley Bank to finance a major acquisition. Two consolidated balance sheets for WHLE were introduced into evidence at trial, both by Plaintiff. (Pl.'s Exs. G and I.) Pl's Ex. G is for 2001. Pl's Ex. I is for 2003. Neither states real estate assets of $2.6 million. From Defendant's testimony, it appears that the double-counting may have actually occurred on a consolidated financial statement from after 2003, and was also corrected at some point after 2003 but before 2006. No testimony from any witness on this topic was particularly enlightening. No financial statement from 2002 was introduced at trial, but one was made part of the record at the summary judgment stage of this proceeding, and also does not show real estate worth $2.6 million. The only place that the Court has found the Myersville Road property included in a corporate balance sheet was in a dual-column balance sheet comparing 2003 and 2004, which means that this statement must have been produced in or later than January of 2005. (Ex. 1 to Def.'s Resp. to Mot. for Summary Judgment.)

5

## LEGAL ANALYSIS AND CONCLUSIONS OF LAW

The question in this case is simple: Who's left without a remedy, the fool or the fool who follows him?

A creditor seeking a judgment of nondischargeability must prove each of the elements of his complaint for the same by a preponderance of the evidence. See, e.g., Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge are construed strictly against the creditor. Rembert v. AT&T Universal Card Servs. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998) (citation omitted).

### I. § 523(a)(2)(A) Inapplicable Because Statements Concerned Debtor's Financial Condition

Under § 523(a)(2)(A), a debt is nondischargeable if credit was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). If a statement is "respecting the debtor's or an insider's financial condition," however, it can only be found nondischargeable if 11 U.S.C. § 523(a)(2)(B) applies, and any such statement must be in writing. See Willens v. Bones (In re Bones), 395 B.R. 407, 429 (Bankr. E.D. Mich. 2008). The Sixth Circuit has elaborated on the requirements of § 523(a)(2)(A), when it applies, as follows:

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

Rembert at 280-81 (citation omitted).

"Justifiable" reliance is actually a lower standard than the "reasonable" reliance a creditor must prove to prevail in a nondischargeability action under § 523(a)(2)(B), notwithstanding the fact that this may result in needing to prove a lesser degree of reliance upon an oral statement than upon a written statement to prevail on a nondischargeability action. See Field v. Mans, 516 U.S. 59, 446-47 (1995) (explaining, in Part V, the anomaly that "a debtor who makes a misrepresentation with the formality of a written financial statement may have less to bear than the debtor who commits his fraud by a statement, perhaps oral, about something other than his bank balance"). The level of reliance required is one of two significant differences between nondischargeability claims under 11 U.S.C. § 523(a)(2)(A) and (B). The other is that misrepresentations "respecting the debtor's or an insider's financial condition" must have been in writing, and can only be deemed nondischargeable under subsection (B), not subsection (A). Willens v. Bones (In re Bones), 395 B.R. 407, 430 (Bankr. E.D. Mich. 2008). In turn, § 523(a)(2)(B) can only be invoked to prevent the discharge of debts based on statements "respecting the debtor's or an insider's financial condition." Subsections (A) and (B) are therefore mutually exclusive. CSM Federal Credit Union v. Lange (In re Lange), 40 B.R. 554 (S.D. Ohio 1984).

6

Since the two causes of action are mutually exclusive, the Court will analyze any given statement by Defendant under one subsection or the other, not both. It is therefore necessary to resolve what is meant by the statutory phrase "respecting the debtor's or an insider's financial condition." The Code does not define this phrase, and a split of authority has developed among the circuits and the lower courts regarding how broadly to read this language. Under the "broad" interpretation, a statement may qualify as respecting one's financial condition if it addresses the status of a single asset or liability, such as whether a specific asset is encumbered. The Fourth Circuit has adopted the broad interpretation. Engler v. Van Steinburg (In re Van Steinburg), 744 F.2d 1060 (4th Cir. 1984). Under the "strict" interpretation, a statement is only considered to respect the financial condition of the debtor or an insider if that communication presents an overall picture of the debtor's financial position–communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities. Cadwell v. Joelson (In re Joelson), 427 F.3d 700, 705 (10th Cir. 2005). The Tenth and Eighth Circuits have adopted the strict interpretation. Id. at 706; Rose v. Lauer (In re Lauer), 371 F.3d 406, 413-14 (8th Cir. 2004). The Sixth Circuit has not yet taken up the issue, though the Bankruptcy Appellate Panel for the Sixth Circuit considered the issue in an unpublished decision and favored the strict interpretation. Prim Capital Corp. v. May (In re May), 368 B.R. 85 (B.A.P. 6th Cir. 2007) (unpublished). This Court has previously ruled that Bankruptcy Appellate Panel decisions are to be considered persuasive but nonbinding authority. See In re Terrell, No. 08-60172 (Bankr. N.D. Ohio January 15, 2009). Terrell, however, dealt with the issue of the authority of B.A.P. cases in the context of a published B.A.P. decision, In re Thomas, 395 B.R. 914 (B.A.P. 6th Cir. 2008). This does not mean that bankruptcy courts should completely discount unpublished B.A.P. opinions, but unpublished decisions of any court are universally considered lesser authority than published decisions. At least one district court and one bankruptcy court in this circuit have considered this issue since the May decision and adopted the argument in favor of the strict interpretation. Holmes v. Nat'l City Bank (In re Holmes), 2009 WL 388230 (E.D. Mich. Feb. 13, 2009); Buckeye Retirement Co. v. Kakde (In Re Kakde), 382 B.R. 411 (Bankr. S.D. Ohio 2008). Another noted the split in case law at the circuit level, as well as the existence of the May opinion, but then decided that it was unnecessary to resolve that issues because the creditor's reliance on the debtor's statements in that case did not even rise to the level of justifiable reliance, so it was unnecessary to examine whether or not the statements in question respected the financial condition of the debtor, and therefore whether the reasonable reliance or justifiable reliance standard would apply. Bones, 395 B.R. at 431.

For a different reason, this Court finds that it need not take sides in the split between the circuits, nor evaluate the persuasiveness of the B.A.P.'s reasoning at this time. The reason is that the confidential financial statements signed by Leach are in fact representations respecting his entire net worth. The fact that Plaintiff focused only on specific components of those financial statements does not mean that the entire statements were not at issue when procuring that statement was the entire purpose of McFeeters' visit to HRM in April of 2003, and it was on the basis of the entire statement that St. Marys extended additional credit to Leach. Even the strict interpretation of "financial condition" does not compel a finding that a written statement of a debtor's net worth is actually not such a statement if a creditor does not contest the bottom line directly; to accept such a conclusion would essentially read § 523(a)(2)(B) out of the Code, since almost no written statements of one's net worth will be completely absent any subsidiary line items (nor should they be), and any creditor pursuing a dischargeability action will naturally focus on a specific item or set

7

of items. The only oral representation Leach is alleged to have made that could have been interpreted to be independent of the financial statement itself was that the "stocks owned" line item consisted of "marketable securities," but the Court has already found Plaintiff's lead witness' recollection of the conversation he had at HRM's headquarters in 2003 unpersuasive. The Court therefore turns to analyze the February 2003 Statement under § 523(a)(2)(B).

## II. Nondischargeability Based on a Materially False Written Statement

Under 11 U.S.C. § 523(a)(2)(B), a debt is nondischargeable if credit was obtained by

(B) use of a statement in writing
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

Id.; see also Fahey Bank v. Benton (In re Benton), 367 B.R. 592, 596 (Bankr. S.D. Ohio 2006); Carson v. Chamberlain (In re Chamberlain), 330 B.R. 195, 203 (Bankr. S.D. Ohio 2005).

Defendant did not contest that the February 2003 Statement was a statement in writing or that it respected his financial condition. The issues remaining are, therefore, whether the statement was materially false, whether the creditor reasonably relied on the statement, and whether debtor caused it to be made with the requisite level of intent.

### A. Material Falsity

Given the facts presented at trial, it is now clear that the February 2003 Statement was materially false.

A written statement is materially false if it "paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." Midwest Comm. Fed. Credit Union v. Sharp (In re Sharp), 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007). "For the purposes of § 523(a)(2)(B)(i), a statement is materially false if it 'contains an important or substantial untruth. The measuring stick of material falsity is whether the [creditor] would have made the loan if the debtor's true financial condition had been known.'" Haney v. Copeland (In re Copeland), 291 B.R. 740, 782 (Bankr. E.D. Tenn. 2003) (quoting First Nat'l Bank v. Sansom (In re Sansom), 224 B.R. 49, 54 (Bankr.M.D.Tenn.1998)). A debtor's overstatement of assets or income, or understatement of his liabilities, can render a statement materially false. See James Truck Centers, Inc. v. Hodges (In re Hodges), 116 B.R. 558, 561 (Bankr. N.D. Ohio 1990) (listing shares of stock and two pieces of real estate as assets that debtor did not own on an application for credit held to be a materially false statement).

"When a creditor requests information regarding personal assets from a debtor, the creditor is generally only interested in 'fair market value' in order to determine whether sufficient equity

8

exists to be able to recover from the debtor in the event of a default." Mich. Nat'l Bank v. Newman (In re Newman), 7 F.3d 234, at *2 (6th Cir. 1993) (unpublished table opinion). "Replacement cost, historical cost, and other valuation methods are generally not useful to the creditor; these have little relation to an asset's liquidation value, the primary concern of a creditor." Id. In Newman, the court held that insufficient evidence had been presented to support a finding of material falsity in the debtor's personal financial statement because no evidence of the actual value of the allegedly overvalued property was introduced, and the court deemed it insufficient to introduce only evidence of improper valuation methodology on the part of the debtor. Id. at *3. In that respect, the trial in the matter at hand paralleled the Newman trial: Plaintiff introduced no evidence of the actual valuation of the "stocks owned"–the debtor's companies–circa 2002 or 2003. Therefore, the fact that Defendant used only a blend of historical cost–what he paid for the companies and contributed to them–and his own, layman's subjective valuation of the companies, is not, standing alone, sufficient to find that the financial statements were materially false.

This case differs from Newman, however, in the fact that Plaintiff introduced additional evidence of material falsity that does not turn on a judicial determination of the stocks' fair market values as of 2003. In particular, the omission of the itemization of the stocks owned is relevant regardless of the actual value of WHLE, because it was the mere fact that they were Leach's own companies, not any valuation he might have placed on them, realistic or otherwise, that would have affected St. Marys' decision to extend HRM additional credit. In addition, the inclusion of real estate that was double-counted on the financial statements of both HRM, the company, and Leach, the owner, is a material misstatement regardless of the property's value. "Writings containing pertinent omissions may qualify as materially false for purposes of a section 523(a)(2)(B) violation." European Am. Bank v. Launzel-Pennes (In re Launzel-Pennes), 191 B.R. 6, 11 (Bankr. E.D.N.Y. 1996). The omission of the attachment detailing the list of stocks owned–revealing it to be nothing but the companies the guarantor owned–was a pertinent omission that would doubtlessly have influenced St. Marys' decision whether to extend the loan. Likewise, Leach's net worth as reported on the February 2003 Statement would have been dramatically different had not the $2.6 million parcel of commercial real estate been counted in both the personal and company books, since the value of the companies is part of Leach's personal wealth: Leach reported that he owned the land and also owned the company that owned the land. The omission of the itemized list of stocks owned, and the double-counting of the commercial real estate, misrepresented information of the type which normally would affect the decision to grant credit, namely, the likelihood that the guarantor would actually have assets sufficient to satisfy the liabilities should the obligation to do so fall upon him.

Plaintiff also attempted to introduce additional evidence of material falsity with respect to Defendant's gambling debts. As noted in the factual and procedural background section of this opinion, this is the first time that this issue has been brought up at any stage in this proceeding. It was not mentioned in Plaintiff's complaint, motion for summary judgment, or proposed findings of fact and conclusions of law, despite the fact that the only document Plaintiff introduced to prove the debt was Defendant's own schedules, which would have been available from the outset of this adversary. Fed. R. Civ. P. 9(b), incorporated into the rules for adversary proceedings by Fed. R. Bankr. P. 7009, requires parties alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake," although malice, intent, knowledge, and other state

9

of mind issues may be alleged generally. To satisfy Fed. R. Civ. P. 9(b), a plaintiff must at a minimum allege the time, place, and contents of the misrepresentation upon which he relied. Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir. 1984). When the complaint involves an exception to or a denial of a discharge based on the fraudulent conduct of the debtor, the courts have liberally applied and interpreted pleading rules, particularly in situations where a trustee, a third party, is pleading fraud on secondhand information. Baltimore Spice Co. v B.J. Packing, Inc. (In re B.J. Packing, Inc.), 1991 WL 335436, at *3 (Bankr. N.D. Ohio 1991) (citing Hassett v. Zimmerman (In re O.P.M. Leasing Svcs., Inc.), 32 B.R. 199, 202 (S.D.N.Y. 1983). In this case, however, there is no issue of secondhand information, as it is the creditor itself bringing the allegation forward, not a trustee. In addition, the circumstances here go well beyond a lack of specificity in the complaint. The complaint was unspecific, but additionally, plaintiff had numerous opportunities to at least *mention* this issue prior to trial: it could have mentioned it in its summary judgment motion, which focused entirely on the § 523(a)(2)(B) cause of action; it could have mentioned it in its proposed findings of fact and conclusions of law; and it could have filed a trial brief, as Defendant did, setting forth the arguments which it intended to prove at trial. It did none of those. The entire record on this issue consists of Defendant's bankruptcy schedules, Defendant's testimony at trial that he had paid those debts (although he could not recall when), and brief mentions in the parties' post-trial briefs. The Court therefore finds that this issue is not properly before the Court and makes no finding of fact or conclusion of law based on the evidence submitted. Since the Court has already found that Defendant's omissions and misstatements are sufficient to find that his financial statements were materially false even without the inclusion of these gambling debts, declining to take up this issue has no bearing on the outcome of this adversary.

### B. Reasonable Reliance

In Bank One, Lexington, N.A. v. Woolum (In re Woolum), 979 F.2d 71 (6th Cir. 1992), the Sixth Circuit held that "reasonable reliance" under 11 U.S.C. § 523(a)(2)(B) "is a factual determination to be made in light of the totality of the circumstances." Id. at 75. The issue of reasonable reliance has been subdivided into two distinct inquiries: (1) whether the creditor actually relied on the materially false statement, and (2) whether that reliance was objectively reasonable. Nat'l City Bank v. Plechaty (In re Plechaty), 213 B.R. 119, 126 (B.A.P. 6th Cir. 1997). Even were Plaintiff being held to the lesser standard of "justifiable" reliance, justifiable reliance is not an utterly impotent requirement. A person held to that standard is still "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Field, 516 U.S. at 71. The standard to which the person is held when justifiable reliance is the applicable test is simply a subjective one, not an objective one; it is "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. Here, under the reasonable reliance standard, Plaintiff must demonstrate that its reliance was not merely justifiable, but objectively reasonable. Among the circumstances that might affect the reasonableness of a creditor's reliance are:

> (1) whether the creditor had a close personal relationship or friendship with the debtor;
> (2) whether there had been previous business dealings with the debtor that gave rise

to a relationship of trust;
(3) whether the debt was incurred for personal or commercial reasons;
(4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and
(5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

BancBoston Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir. 1992).

It is here that Plaintiff's case breaks down. It became apparent at trial that Plaintiff requested a list of stocks owned in April of 2003. It then continued to extend additional credit to HRM on an almost monthly basis for *three and a half years* after making that request, notwithstanding the fact that Leach never fulfilled that request either the first time McFeeters made it in person, in April 2003, nor the second, in April 2006. The creditor did not have a close personal relationship or friendship with the debtor, or with HRM; the creditor is a national business and even the business relationship was new. McFeeters himself was based out of Toronto at the time, and his area of responsibility encompassed the entire United States. The previous dealings between the parties establishes almost the exact opposite of a "relationship of trust": HRM was on COD terms with Plaintiff for some of that period, but far from all of it. The company was already behind on its payments to St. Marys when McFeeters visited HRM in 2003, and in fact was already behind in 2002 when Leach executed the personal guarantee on behalf of his company. St. Marys did not have a great deal of faith in HRM; therefore, it asked for the personal guarantee from Leach in July of 2002. St. Marys also did not have a great deal of trust in Leach; therefore, it asked for the personal financial statement from him in April of 2003. The debt was incurred for commercial reasons. While there might not have been "red flags" raised at the meeting in 2003 itself, the fact that Leach perennially refused to give St. Marys the list of securities he owned certainly should have given St. Marys pause; Leach's assertion that the list of stocks owned was with his accountant might have been credible the day of the meeting–though even that is questionable if St. Marys had notified Leach in advance of McFeeters' visit that he would be requesting such a list, a question which was not asked at trial–but it should have quickly worn thin. Notwithstanding that, St. Marys continued to sell Leach cement on credit. As to whether minimal investigation would have revealed the inaccuracy of the debtor's representations, the Court is unconvinced that Leach in fact made the "inaccurate representation" that Plaintiff claims Leach made to McFeeters, namely, that the "stocks owned" were "marketable securities." Nevertheless, a minimal investigation *would* have revealed that the stocks owned were Leach's ownership interests in his own companies, which would have had the effect of revealing the truth of the matter regardless of whether Leach made that oral representation. Alternatively, had Leach stonewalled such a minimal investigation, it would have served as a "red flag" that would have alerted an ordinarily prudent lender that important information was being concealed. Similarly, *any* investigation would have revealed the double counting of the real estate and the unexplained bounce in the value of the stocks. In this case, St. Marys simply was not "ordinarily prudent."

### C. Intent to Deceive

For the purposes of 11 U.S.C. § 523(a)(2)(B)(iv), the element of intent to deceive can be

11

established by showing, first, that the debtor had some duty to provide the creditor with the financial statement, and second, showing that the debtor either intended the statement to be false or that the statement was grossly reckless as to its truth. Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1167 (6th Cir. 1985); see also Woolum, 979 F.2d at 73.

Defendant had a duty to submit the financial statement to Plaintiff because Defendant agreed to do so in order to obtain forbearance on existing debt as well as additional credit. The February 2003 Statement that Defendant submitted was made with gross recklessness as to its truth. The last professional appraisal of any portion of WHLE enterprises had been in 1998, when Defendant bought HRM from his father's estate. The valuations of the stocks owned were based on Defendant's own opinions as to the value of his companies, as well as the value of the capital contributions Leach had made to the companies. He testified that the $3.5 million figure was the figure he'd ask for it if someone were to buy it–not what he would get for it. Some of those capital contributions were in the form of equipment; it became clear on the stand that Leach had little knowledge of depreciation in accounting, and he gave no sign that he understood the effect that depreciation of that equipment would have on the overall valuation of his company. More importantly, the companies were having chronic cash flow problems. The Court does not doubt that Leach sincerely believed that his companies were worth that much, but there was simply no empirical basis whatsoever for that belief. It was a figure conjured from the sand of Leach's own dreams. The Court finds that Defendant therefore caused the February 2003 Statement to be made with gross recklessness as to its truth or falsity.

### III. Checks on the Eve of Bankruptcy

As an unrelated matter, Plaintiff also complains that HRM passed two bad checks to St. Marys on the eve of bankruptcy, totaling $38,836.95, that Plaintiff should be liable for this debt, and that it should be held nondischargeable under § 523(a)(2). In the complaint, Plaintiff does not specify whether he is alleging this is a violation of § 523(a)(2)(A) or (B). Plaintiff did not file a trial brief and its proposed findings of fact and conclusion of law do not even mention these checks. Defendant's trial brief answered that the funds were in the account until HRM declared bankruptcy on December 29, 2006. The checks are dated December 19, 2008, so Plaintiff did at least have a chance to clear the checks prior to Defendant's filing. The amount of evidence introduced at trial on this issue was scanty, and it should not have been that difficult to get a bank statement of HRM from December of 2006. Plaintiff bears the burden of proving the elements of any nondischargeability complaint, and did not come near to doing so with respect to these checks.

### IV. Conclusion

With respect to Debtor's representations about his stock portfolio and real estate, Defendant did make a materially false written statement with respect to his financial condition with gross recklessness as to their truth or falsity. However, Plaintiff's reliance on that false statement was simply not reasonable. To all appearances, Plaintiff made a *pro forma* request for the list of stocks Leach owned and then let the matter drop, or never brought it up again with much force, between April of 2003 and HRM's bankruptcy filing in December of 2006.

12

With respect to the checks issued by HRM on the eve of the latter's bankruptcy, Plaintiff did not introduce sufficient evidence to carry its burden under either prong of § 523(a)(2). No judgment of nondischargeability can be sustained on the scant evidence offered to the Court on this issue.

An order in accordance with this memorandum shall be entered contemporaneously.

/s/ Russ Kendig
───────────────────────────
RUSS KENDIG
U. S. BANKRUPTCY JUDGE

**Service List**:

David G. Finley
45 W. Prospect Ave., #1650
Cleveland, OH 44115

John A Daily
Daily & Freeman
2475 Massillon Rd
Akron, OH 44312

William Howard Leach, Jr.
2859 Daisybrook Street, NW
North Canton, OH 44720

St. Marys Cement Co.
250 Jefferson Ave.
Cleveland, OH 44113

Matthew Thomas
45 W Prospect Ave
Ste 1650-G
Cleveland, OH 44115